UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

NURY VASCONCELLOS,                    :

                    Plaintiff,        :
                                          05 Civ. 10479 (GBD)(HBP)
     -against-                        :
                                          REPORT AND
THE MOUNT SINAI MEDICAL CENTER,       :   RECOMMENDATION

                    Defendant.        :

-----------------------------------X

            PITMAN, United States Magistrate Judge:


            TO THE HONORABLE GEORGE B. DANIELS, United States

District Judge,


I.  Introduction


            This is a pro se employment discrimination action in

which plaintiff alleges that she was the victim of discrimination

on the basis of a disability in violation of the Americans with

Disabilities Act ("ADA")[1], 42 U.S.C. §§ 12112 - 12117, and on the

---

[1]Plaintiff commenced this action using the form complaint
provided by the Court's Pro Se Office.  She did not check the box
corresponding to the ADA, nor did she check "disability" as a
basis for defendant's alleged discrimination (Complaint, dated
March 10, 2005 (Docket Item 2), ("Compl.") ¶ 7).  However,
plaintiff stated in a written submission with her complaint that
her being "disabled" was a reason for her termination
(Plaintiff's Written Submission, dated March 10, 2005, attached
to Compl. as Ex. A, ("Pl.'s Submission") at 3).

basis of her gender, national origin, religion and race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e - 2000e-17, and New York State's Human Rights Law, N.Y. Exec. Law § 296(10).[2]  Plaintiff also alleges that she was the victim of illegal retaliation, although she does not specify whether her retaliation claim is asserted under the ADA, Title VII or both.[3]

Defendant moves for summary judgment dismissing the complaint (Docket Item 29).  For the reasons set forth below, I respectfully recommend that defendant's motion should be granted in all respects.

---

[2]In her written submission, plaintiff stated that she was terminated based on her "being Latina, a woman, disabled, [and] a Christian" (Pl.'s Submission at 3), but checked only race, religion and national origin in the form complaint (Compl. ¶ 7).

[3]Plaintiff also failed to check the space corresponding to "retaliation" in the form complaint (Compl. ¶ 4), but stated in her written submission that she believed she was terminated as a result of her "complaining to Labor Relations" (Pl.'s Submission at 3).

I.  <u>Facts</u>

   A.  <u>Background</u>

      1.  Plaintiff's Employment
         with Defendant

Most of the material, relevant facts are derived from defendant's submissions which, in substantial part, are not controverted.

Plaintiff, a Hispanic female, commenced working for defendant as a volunteer in the Neurology Department of Mount Sinai Medical Center in February 1997 (9:12-16 Deposition of Nury Vasconcellos, dated September 8, 2006 ("Pl.'s Dep."), attached to the Declaration of Rory J. McEvoy, dated April 30, 2010 ("McEvoy Decl."), as Ex. 1).  In March of that year, she became the Inquiry Coordinator/Administrative Assistant in the Medical Staff Services Department (11:19-12:7 Pl.'s Dep; Memorandum of Law in Support of Defendant's Motion for Summary Judgment, dated April 30, 2010 (Docket Item 30), ("Def.'s Mem. in Supp.") at 3). Plaintiff then applied for an Administrative Assistant position in the Selikoff Center in July 1999.  She was interviewed and hired by Karen Leitson and assumed the position in December 1999 (43:4-52:15 Pl.'s Dep.; Declaration of Karen Leitson, dated April 27, 2010, ("Leitson Decl.") ¶ 3).  Leitson remained plaintiff's

3

supervisor throughout her employment, with the exception of
Leitson's brief period of leave in 2002-2003 (Leitson Decl. ¶¶ 2,
12).

Plaintiff's probationary appraisal period spanned from
December 8, 1999 to March 8, 2000 (Leitson Decl. ¶ 4).  During
this time, and at the completion of her first year, Leitson rated
plaintiff generally as "meet[ing] expectations," and "exceed[ing]
expectations" in certain areas (Leitson Decl. ¶ 4; Probationary
Performance Evaluations, dated March 7, 2000, attached to Leitson
Decl. as Ex. 1, at 1-2; Yearly Performance Evaluation, dated July
11, 2001, attached to Leitson Decl. as Ex. 2, at 1-6).

In 2001, plaintiff's job performance began to decline.
She was late to work at least three days per week, at times by
thirty minutes (Leitson Decl. ¶ 5).  When Leitson discussed this
issue with plaintiff on November 12, 2001, plaintiff claimed that
altered train schedules due to the September 11, 2001 World Trade
Center attacks had affected her commute.  Plaintiff agreed to
arrive to work on time in the future (Leitson Decl. ¶ 5; Docu-
mented Conference, dated November 12, 2001, attached to Leitson
Decl. as Ex. 3, at 1).[4]

---

[4]Plaintiff presently claims that employees whose shift began
at 9 a.m. had a twenty minute "grace period" for arrival
(Affirmation in Opposition to Motion, dated August 23, 2010
                                                (continued...)

4

Around the same time, plaintiff struggled to complete her assignments in a timely manner (Leitson Decl. ¶ 6).  For example, on December 19, 2001 and February 4, 2002, plaintiff failed to update a physician data spreadsheet to include social security numbers and insurance plans as assigned (Leitson Decl. ¶ 7).  On February 11, 2002 and March 2, 2002, Leitson asked plaintiff to update a missing chart list, which plaintiff also neglected to do.[5]  Similarly, in April 2002 Leitson asked plaintiff to replace the last page of an asbestos questionnaire, but plaintiff failed to complete this task and misplaced the replacement page (Leitson Decl. ¶¶ 8-9; Email of Karen Leitson to Nury Vasconcellos, dated April 25, 2002, attached to Leitson Decl. as Ex. 4, at 1).

On May 24, 2002, plaintiff had an "outburst" in Leitson's office because she did not believe that a particular typing assignment was part of her job.  Leitson later called a

_____

[4](...continued)
(Docket Item 31), ("Pl.'s Affirmation") at 3).  Plaintiff has not provided any evidence of this practice apart from her own affirmation.

[5]Plaintiff claims that she did not respond to Leitson's email in writing regarding these missing charts because she customarily responded to her verbally (Pl.'s Affirmation at 3). This statement is belied by the numerous emails between Leitson and plaintiff regarding job assignments and related issues (See Emails of Karen Leitson and Nury Vasconcellos, attached to Leitson Decl. as Exs. 4, 13-15, 18-19).

meeting with plaintiff to discuss this incident, as well as her
general struggle to complete assignments, and reminded her of her
position's responsibilities (Leitson Decl. ¶ 10; Documented
Conference, dated May 28, 2002, attached to Leitson Decl. as Ex.
5, at 1).  Plaintiff claims to have no memory of this conference
and points out that she did not sign the Documented Conference
form (Pl.'s Affirmation at 4).  Leitson did not sign this form
either.

          Leitson met with plaintiff on October 9, 2002 to
evaluate her performance during the period of July 1, 2001 to
June 30, 2002 (Leitson Decl. ¶ 11; Documented Conference, dated
October 9, 2002, attached to Leitson Decl. as Ex. 6, at 1-7).  In
this evaluation, Leitson rated plaintiff as "needs improvement."
She then planned for plaintiff to record a daily list of assign-
ments, review and prioritize this list with the Assistant Man-
ager, and meet with Leitson bi-weekly to review her progress
(Leitson Decl. ¶ 11; Documented Conference, dated October 9,
2002, attached to Leitson Decl. as Ex. 6, at 1-7).  Plaintiff
submitted a written response to this evaluation stating "[t]he
Performance Appraisal is inconsistent and unfactual with the
actual duties and responsibilities assigned to me for the period
7/01/01 to 6/30/01."  She also stated that, because she had been
given more responsibilities over time, she "was not able to

complete [her] task in a timely manner" (173:19-177:9 Pl.'s Dep.;
Documentation in Response to the Performance Appraisal, dated
October 14, 2002, attached to Pl.'s Dep. as Ex. 18, at 1).

During the period from July 2002 to mid-2003, Anne
Kochman and Sharon Gluck supervised plaintiff while Leitson
worked on the World Trade Center screening project (Declaration
of Anne Kochman, dated April 28, 2010, ("Kochman Decl.") ¶ 2;
Declaration of Sharon Gluck, dated April 29, 2010, ("Gluck
Decl.") ¶ 2).  Kochman and Gluck formally evaluated plaintiff's
performance on February 23, 2003 and noted that she continued to
struggle with tardiness and resistance to assignments.  They
informed plaintiff that she would be disciplined if these prob-
lems persisted (Kochman Decl. ¶¶ 3, 5; Gluck Decl. ¶ 5; Three
Month Review, dated February 25, 2003, attached to Kochman Decl.
as Ex. 1, at 1).  Plaintiff claims that she never received this
review (Pl.'s Affirmation at 7).

Leitson resumed her supervision of plaintiff in mid-
2003 and documented additional acts of insubordination and poor
performance (Leitson Decl. ¶ 12).  In May 2003, Leitson in-
structed plaintiff to confirm patient appointments two days in
advance, which she had previously failed to do, and plaintiff

7

responded that she "couldn't work this way"[6] (Leitson Decl. ¶ 13).  Leitson provided plaintiff with a written memorandum regarding this incident on May 8, 2003, which plaintiff refused to sign (Leitson Decl. ¶ 13; Documented Conference, dated May 8, 2003, attached to Leitson Decl. as Ex. 7, at 1).

        Because plaintiff's performance continued to decline, Leitson rated her as "needs improvement" in her October 1, 2003 evaluation.  Leitson claimed that plaintiff still struggled to prioritize tasks and was insubordinate in her resistance to and questioning of assignments[7] (Leitson Decl. ¶ 14; Performance Appraisal Form, dated October 1, 2003, attached to Leitson Decl. as Ex. 8, at 1).  Leitson also noted plaintiff's excessive tardiness and absenteeism.  On October 21, 2003, Leitson provided plaintiff with a written memorandum listing eleven unscheduled absences since July 1, 2003 (Leitson Decl. ¶ 15).  This memoran-

---

[6]Plaintiff presently argues that she could not perform this task due to a computer problem and maintains that her statement was not a reflection of her ability to complete her work, but of Leitson's "criminalization" of her honest behavior (Pl.'s Affirmation at 4).

[7]Plaintiff has submitted what appears to be pages from her Outlook account and lists of daily tasks as evidence of her adequate assignment completion and prioritization.  However, plaintiff has not specifically addressed any of the incidents cited by defendant, nor has she provided any substantiation or explanation of these exhibits (Pl.'s Affirmation at 4-5; Outlook Pages and Task Lists, attached to Pl.'s Affirmation as Ex. 1, ("Outlook Pages") at 1-7).

8

dum also stated that plaintiff had reached an "alert level" and
that "[a]ny further repetition of reaching an alert level will
result in disciplinary action up to and including termination."
Plaintiff wrote on this memorandum that all absences were due to
illness and had been supported by medical documentation as
required (Documented Conference #2, dated October 20, 2003,
attached to Leitson Decl. as Ex. 9, at 1).

On November 25, 2003, plaintiff received a "final
warning" for insubordination after confronting Leitson in her
office and yelling "Karen, you are lying" (Leitson Decl. ¶ 16;
Final Warning, dated November 25, 2003, attached to Leitson Decl.
as Ex. 10, ("Final Warning") at 1).  Plaintiff circled the term
"outburst" on this form and wrote "I was speaking w/ a low tone"
(Final Warning at 1).  Plaintiff claims that she did not yell and
that Gluck, who was present during this incident, did not say she
raised her voice when she discussed the matter at a Labor Rela-
tions meeting[8] (Pl.'s Affirmation at 5).  Plaintiff does not deny

_____

[8]Plaintiff claims that she opened a grievance with Labor
Relations in November 2003 regarding this incident and also
complained about Leitson's harassment of Hispanic employees
(Pl.'s Affirmation at 9-10).  She reports that Leitson was
offered the option to transfer plaintiff and allow Labor
Relations to temporarily remove the disciplinary warning from her
personnel file, but Leitson declined to do so (Pl.'s Affirmation
at 10-11).  In support of this assertion, plaintiff provides a
disposition slip noting the warning would stand, but would be
(continued...)

making this statement and has not provided any documentation
regarding Gluck's statements to Labor Relations.

On December 17, 2003, Leitson stated in plaintiff's
follow-up evaluation that, while she had improved in her accep-
tance and completion of assignments, plaintiff continued to
arrive late and exceed the appropriate amount of unplanned paid
time off ("PTO") (Leitson Decl. ¶ 17; Year 2003 Performance Below
Expectation Form, dated December 17, 2003, attached to Leitson
Decl. as Ex. 11, at 1).  Plaintiff was again absent from work two
weeks later on December 29, 2003, and refused Leitson's many
requests for medical documentation of this and any future un-
planned absence.  Plaintiff also challenged Leitson's authority
to require such documentation (Leitson Decl. ¶ 18; Emails of
Karen Leitson and Nury Vasconcellos, dated January 20-21, 2004,
attached to Leitson Decl. as Ex. 12, at 1-2).[9]

_____

[8](...continued)
removed temporarily should plaintiff have a "potential transfer
opportunity" (Grievance Form, dated February 4, 2004, attached to
Pl.'s Affirmation as Ex. 6, at 1).  The circumstances
precipitating and following this disposition are unclear.

[9]Karen Johnson, Senior Labor Relations Specialist for The
Mount Sinai Hospital, reports that supervisors may request
medical documentation of unscheduled PTO if an employee's
attendance record shows "excessive days, patterns of absence or
other suspected abuse" (Declaration of Karen Johnson, dated April
28, 2010, ("Johnson Decl.") ¶ 8).

Plaintiff again took unplanned PTO on February 26, 2004.  Plaintiff reported that she had a 12:30 p.m. doctor's appointment and then "had to handle 'school problems with financial aid'" for the remainder of the day (Leitson Decl. ¶ 19; Emails of Karen Leitson and Nury Vasconcellos, dated February 27, 2004, attached to Leitson Decl. as Ex. 13, at 1-2).  On April 6, 2004, plaintiff used five hours of unplanned PTO.  When Leitson emailed plaintiff requesting a doctor's note for this absence, plaintiff replied "I am required to give you a doctor's note after being out for 3 days or more.  I am quite sure you know of this policy" (Leitson Decl. ¶ 20; Emails of Karen Leitson and Nury Vasconcellos, dated April 6, 2004, attached to Leitson Decl. as Ex. 14, at 1).  The following day, Leitson sent a memorandum to plaintiff again requesting this documentation stating "[d]ocumentation must be received by Monday, April 12, 2004, or we will have no choice but to take disciplinary action for unauthorized absence and failure to follow instructions." Leitson further noted that plaintiff's comments were "inappropriate" and that "[t]his insubordinate behavior can not and will not be tolerated" (Leitson Decl. ¶ 21; Memorandum of Documentation Requirement, dated April 7, 2004, attached to Leitson Decl. as Ex. 15, at 1).  Plaintiff did not provide documentation for this absence, nor for subsequent absences on April 26 through April

11

28, 2004 (Leitson Decl. ¶ 22).  On May 3, 2004, Leitson provided plaintiff with a warning notice when plaintiff again failed to provide required documentation.  Leitson wrote that "[a]ny further reoccurrence of this nature will result in disciplinary action up to and including termination" (Leitson Decl. ¶ 22; Warning Notice, dated May 3, 2004, attached to Leitson Decl. as Ex. 16, at 1).[10]

Plaintiff claims that in early 2004 co-workers Shakima Perez and Maria Del Pilar informed her that they were reprimanded for their tardiness and absenteeism as well, and that Perez showed plaintiff a disciplinary email from Leitson (Pl.'s Affirmation at 5).  Plaintiff further claims that Perez used sick days once or twice per week and Leitson would use "strongly accusatory language and, physically 'lean into' Perez while speaking with her" (Pl.'s Affirmation at 6-7).  Plaintiff also reports that Leitson allowed non-Hispanics to arrive late without consequence (Pl.'s Affirmation at 6), but has provided no corroborating evidence of these occurrences.

_____

[10]Plaintiff claims that she submitted documentation of her medical absences when Leitson required it, but only provided doctors' notes dated April 8, 2002, April 9, 2002, March 24, 2003, and October 27, 2003 (Pl.'s Affirmation at 11; Doctors' Notes, attached to Pl.'s Affirmation as Ex. 7).

Leitson completed an interim review of plaintiff on May 19, 2004 and noted that she had been tardy approximately thirteen times since her December 17, 2003 evaluation (Leitson Decl. ¶ 23; Performance Follow-up Evaluation, dated May 19, 2004, attached to Leitson Decl. as Ex. 17, at 1). Leitson also indicated that plaintiff continued to resist assignments, sometimes failed to complete assigned tasks and did not notify Leitson when tasks were not completed (Leitson Decl. ¶ 23).

Plaintiff's poor performance continued following this evaluation. On May 26, 2004, plaintiff challenged Leitson's instruction to temporarily sit at the reception desk (Leitson Decl. ¶ 24; Emails of Karen Leitson and Nury Vasconcellos, dated May 26, 2004, attached to Leitson Decl. as Ex. 18, at 1). On another occasion, when Leitson asked plaintiff if charts on her desk were to be filed in the basement, plaintiff responded "why are you asking me?" and "[d]o you have a problem with that?" (Leitson Decl. ¶ 24; Emails of Karen Leitson to Nury Vasconcellos, dated May 26, 2004, attached to Leitson Decl. as Ex. 19, at 1). The following day, Leitson requested that plaintiff log charts into a database, and twenty minutes later found plaintiff instead composing an email to Leitson questioning the assignment (Leitson Decl. ¶ 25). When Leitson asked plaintiff to begin her assignment, plaintiff resisted and would only communi-

13

cate with Leitson via email for the remainder of the day (Leitson
Decl. ¶ 26).  Similarly, when Leitson asked plaintiff to schedule
a list of patient appointments on June 2, 2004, plaintiff re-
sponded "[w]hy isn't Shakima doing this?," "[t]his is Shakima's
job," "[d]oesn't Shakima want to do this," "I am working on
something else" and finally exclaimed "[t]his is unbelievable" as
she exited Leitson's office (Leitson Decl. ¶ 27).  Leitson later
emailed plaintiff and informed her that such responses were
examples of her resisting assignments (Leitson Decl. ¶ 28;
Warning Email, dated June 10, 2004, attached to Leitson Decl. as
Ex. 20, at 1).

        Other supervisors documented similar behavior by
plaintiff.  Gluck, for instance, reported that plaintiff had
spoken to her in a "confrontational manner" and once walked out
of Gluck's office while she was giving her an assignment (Gluck
Decl. ¶¶ 3, 6; Email of Sharon Gluck to Karen Leitson, dated June
25, 2004, attached to Leitson Decl. as Ex. 21, at 1).  Leitson
documented a similar incident in which she asked plaintiff to
label x-rays and plaintiff replied that she could not work this
way and needed to have a meeting with Leitson (Leitson Decl.
¶ 29; Emails of Karen Leitson, dated June 25, 2004, attached to
Leitson Decl. as Ex. 21, at 1).  Leitson then found plaintiff

14

typing an email to Labor Relations regarding her assignment (Leitson Decl. ¶ 29).

Plaintiff received another "final warning" on June 28, 2004.  This warning stated that, since December 8, 2003, plaintiff had been tardy fourteen times and had used eight unscheduled PTO days (Leitson Decl. ¶ 30; Final Warning Notice, dated June 28, 2004, attached to Leitson Decl. as Ex. 23, at 1).  Later that day, plaintiff refused to answer Leitson when she asked whether plaintiff had given a co-worker a schedule.  Plaintiff responded only "I emailed you" even after Leitson told her that this email did not answer her question (Leitson Decl. ¶ 31).  When Leitson explained that she may have misunderstood the email, plaintiff replied "Karen, I am not going to answer you" (Leitson Decl. ¶ 31).  Leitson consulted with Caryn Tiger-Paillex, then the Labor Relations Manager at The Mount Sinai Hospital, and Labor Relations "agreed that the termination of Vasconcellos' employment was necessary" (Leitson Decl. ¶ 35; Declaration of Caryn Tiger-Paillex, dated April 29, 2010, ("Tiger-Paillex Decl.") ¶ 6).[11]  Plaintiff was then terminated for insubordination and failure to follow instructions (Leitson Decl. ¶ 32; Termination

---

[11]Tiger-Paillex reported that Leitson was in regular communication with the Labor Relations staff regarding plaintiff's performance and behavior throughout 2003 and 2004 (Tiger-Paillex Decl. ¶ 5; Leitson Decl. ¶ 35).

Notice, dated June 28, 2004, attached to Leitson Decl. as Ex. 24, at 1).

Leitson hired Carlina Melendez, a Hispanic woman, to replace plaintiff (Leitson Decl. ¶ 37).  When Leitson later promoted Melendez, she hired Denise Perez, also a Hispanic woman, to replace her (Leitson Decl. ¶ 37).

On July 21, 2004, plaintiff sent a letter to Jane Maksoud, Senior Vice President of Human Resources at The Mount Sinai Medical Center, detailing her conversation with Leitson. Plaintiff recounted a much longer conversation concerning whether plaintiff's email adequately addressed Leitson's question, and added that Leitson used an aggressive tone during the exchange. Plaintiff confirmed that the conversation ended with plaintiff's refusal to answer Leitson further (Letter of Nury Vasconcellos to Jane Maksoud, dated July 21, 2004, attached to Pl.'s Dep. as Ex. 64, ("Maksoud Letter") at 1-2).

B.   Plaintiff's Claims and
     Defendant's Arguments

Plaintiff claims that, as a result of illegal discrimination directed at her disability, gender, national origin, religion, and race, defendant terminated her employment, subjected her to unequal terms and conditions of employment and

16

retaliated against her.  Nowhere in the complaint does plaintiff elaborate on any of these claims, except those concerning racial discrimination.  In that regard, plaintiff cited the following examples, among others, as evidence of defendant's racial animus: Leitson encouraged another supervisor to discipline a Latina employee, threatened the employment of a Latina employee, gave warnings to Latina employees that were not given to other employees, terminated every Latino co-worker plaintiff ever had, and only terminated Latino employees (Pl.'s Submission at 2). Plaintiff also claimed that a Caucasian supervisor once commented that Hispanics were not qualified to work in a particular position, that "white-collar" positions were never filled with Latino employees while "blue-collar" positions always were, that Leitson only allowed non-Latinos to transfer to positions with greater earning potential and employment security, and that Leitson hired a less experienced non-Latina employee over Karen Liriano, a previously laid off Latina employee who had since earned a Bachelor's degree (Pl.'s Submission at 2).

Defendant contends that it is entitled to summary judgment for a variety of reasons.  First, defendant argues that, because plaintiff failed to oppose defendant's motion for summary judgment on her claims of discrimination based on disability, gender, national origin and religion, plaintiff has abandoned

those claims (Reply Memorandum of Law in Further Support of
Defendant's Motion for Summary Judgment, dated September 10, 2010
(Docket Item 33), ("Def.'s Reply Mem.") at 2-3).  Second, defen-
dant claims that there is no genuine issue of fact concerning
plaintiff's claim of racial discrimination because (1) plaintiff
admits to or does not deny "virtually all of the misconduct for
which she was disciplined and discharged" (Def.'s Mem. in Supp.
at 13-15; Def.'s Reply Mem. at 3); (2) Leitson is the same person
who hired and fired plaintiff (Def.'s Mem. in Supp. at 15; Def.'s
Reply Mem. at 3); (3) plaintiff never applied for a promotion
(Def.'s Mem. in Supp. at 16-18; Def.'s Reply Mem. at 3); (4)
disciplinary warnings and negative performance appraisals are not
adverse employment actions (Def.'s Mem. in Supp. at 18; Def.'s
Reply Mem. at 3) and (5) there is no evidence that plaintiff was
treated differently because of her race (Def.'s Mem. in Supp. at
18-20; Def.'s Reply Mem. at 3).  Finally, defendant claims that
plaintiff's retaliation claim fails because there is no causal
connection between plaintiff's complaints to Labor Relations and
her discharge, her complaint was too remote in time from her
termination to support an inference of retaliation, and the
misconduct precipitating her termination was well-documented
(Def.'s Mem. in Supp. at 24-25).  Defendant also notes that

plaintiff has not disputed these facts in her affirmation (Def.'s Reply Mem. at 7).

III.  Analysis

A.  Summary Judgment Standard

The standards applicable to a motion for summary judgment are well-settled and require only brief review.

> Summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  This form of relief is appropriate when, after discovery, the party -- here plaintiff -- against whom summary judgment is sought, has not shown that evidence of an essential element of her case -- one on which she has the burden of proof -- exists.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  This form of remedy is inappropriate when the issue to be resolved is both genuine and related to a disputed material fact.  An alleged factual dispute regarding immaterial or minor facts between the parties will not defeat an otherwise properly supported motion for summary judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990). Moreover, the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion; there must be evidence on which a jury could reasonably find for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
>
> If the movant demonstrates an absence of a genuine issue of material fact, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts," and come forward with "specific facts showing that there is a genuine issue for trial."  Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir.

19

> 1993).  If the nonmovant fails to meet this burden,
> summary judgment will be granted against it.  <u>Gallo v.
> Prudential Residential Servs.</u>, 22 F.3d 1219, 1224 (2d
> Cir. 1994).

<u>Powell v. Nat'l Bd. of Med. Exam'rs</u>, 364 F.3d 79, 84 (2d Cir.

2004); <u>accord</u> <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 553-54

(2d Cir. 2005); <u>Gallo v. Prudential Residential Servs., Ltd.</u>, 22

F.3d 1219, 1223-24 (2d Cir. 1994).

     "Material facts are those which 'might affect the

outcome of the suit under the governing law,' and a dispute is

'genuine' if 'the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'" <u>Coppola v. Bear

Stearns & Co.</u>, 499 F.3d 144, 148 (2d Cir. 2007), <u>quoting</u> <u>Anderson

v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>accord</u> <u>McCarthy

v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 202 (2d Cir. 2007).

"'[I]n ruling on a motion for summary judgment, a judge must ask

himself not whether he thinks the evidence unmistakably favors

one side or the other but whether a fair-minded jury could return

a verdict for the [non-movant] on the evidence presented[.]'"

<u>Cine SK8, Inc. v. Town of Henrietta</u>, 507 F.3d 778, 788 (2d Cir.

2007), <u>quoting</u> <u>Readco, Inc. v. Marine Midland Bank</u>, 81 F.3d 295,

298 (2d Cir. 1996).

     "The party seeking summary judgment has the burden to

demonstrate that no genuine issue of material fact exists . . . .

In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Stated more succinctly, '[t]he evidence of the non-movant is to be believed.'" Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 253-54 (2d Cir. 2002) (citations omitted). See also Jeffreys v. City of New York, supra, 426 F.3d at 553 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."), quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996); accord Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004); Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).

        "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy [its] burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." Vann v. City of New York, 72 F.3d 1040, 1048 (2d Cir. 1995). "A defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996).

The Court of Appeals for the Second Circuit has explained that "in determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement.  It must be satisfied that the citation to evidence in the record supports the assertion."  Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); see also Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003).

Summary judgment is "ordinarily inappropriate" in employment discrimination cases where the employer's intent and state of mind are in dispute.  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000); Cifarelli v. Vill. of Babylon, 93 F.3d 47, 54 (2d Cir. 1996); see Gallo v. Prudential Residential Servs., supra, 22 F.3d at 1224; Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d 100, 103 (2d Cir. 1989); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).  Moreover, in discrimination cases

> summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial . . . .  There must either be a lack of evidence in support of the plaintiff's position, . . . or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error.

Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998)
(citations omitted).  See Weber v. Parfums Givenchy, Inc., 49 F.
Supp. 2d 343, 354 (S.D.N.Y. 1999) (Wood, D.J.).

        Although the central role of intent requires that
caution be exercised in addressing a summary judgment motion made
in a discrimination case, "'the salutary purposes of summary
judgment -- avoiding protracted, expensive and harassing trials
-- apply no less to discrimination cases than to . . . other
areas of litigation.'"  Abdu-Brisson v. Delta Air Lines, Inc.,
239 F.3d 456, 466 (2d Cir. 2001), quoting Meiri v. Dacon, supra,
759 F.2d at 998.  Thus, the Court of Appeals for the Second
Circuit has expressly "remind[ed the] district courts that the
'impression that summary judgment is unavailable to defendants in
discrimination cases is unsupportable.'"  Weinstock v. Columbia
Univ., 224 F.3d 33, 41 (2d Cir. 2000), quoting McLee v. Chrysler
Corp., 38 F.3d 67, 68 (2d Cir. 1994).

        Finally, even when a summary judgment motion is unop-
posed, the Court must examine the record to determine whether a
genuine issue of fact exists for trial; a summary judgment motion
cannot be granted on default.  Vt. Teddy Bear Co. v. 1-800
Beargram Co., supra, 373 F.3d at 244.

B.   The McDonnell Douglas Analysis

Discrimination and retaliation claims brought pursuant to the ADA, Title VII, and New York State's Human Rights Law are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010) (Title VII and New York State's Human Rights Law claims);  Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003) (Title VII retaliation claims); Reg'l Econ. Cmty. Action Prog., Inc. v. City of Middletown, 294 F.3d 35, 48-49, 54 (2d Cir. 2002) (ADA and ADA retaliation claims); Cruz v. Coach Stores, Inc., 202 F.3d 560, 567 (2d Cir. 2000) (Title VII claim); Johns v. Home Depot U.S.A., Inc., 03 Civ. 4522 (DC), 2005 WL 545210 at *4 (S.D.N.Y. Mar. 8, 2005) (Chin,  D.J.) (Title VII and New York State's Human Rights Law claims).  "In McDonnell Douglas Corp. v. Green . . . [the Supreme Court] established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory treatment cases."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993), abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc., ---U.S---, 129 S.Ct. 2343, 2351-52 (2009); see also Bickerstaff v. Vassar Coll., 196 F.3d 435, 447 (2d Cir. 1999); Jean-Gilles v. County of Rockland, 195 F.

24

Supp. 2d 528, 531 (S.D.N.Y. 2002) (McMahon, D.J.).  "Following
the Supreme Court's directive, plaintiff must initially come
forward with facts sufficient to establish a <u>prima facie</u> case
that [she suffered an adverse employment action] under circum-
stances giving rise to an inference of discrimination." <u>Greenway
v. Buffalo Hilton Hotel</u>, 143 F.3d 47, 52 (2d Cir. 1998); <u>see</u>
<u>Weiss v. City of New York</u>, 96 Civ. 8281 (LTS)(MHD), 2003 WL
1621403 at *2 (S.D.N.Y. Mar. 28, 2003) (Swain, D.J.).

        "The burden of establishing a <u>prima facie</u> case is not a
heavy one.  One might characterize it as minimal." <u>Carlton v.
Mystic Transp. Inc.</u>, <u>supra</u>, 202 F.3d at 134.  <u>See Holtz v.
Rockefeller & Co. Inc.</u>, 258 F.3d 62, 77 (2d Cir. 2001); <u>Galabya
v. New York City Bd. of Educ.</u>, 202 F.3d 636, 639 (2d Cir. 2000);
<u>Scaria v. Rubin</u>, 117 F.3d 652, 654 (2d Cir. 1997) (<u>per curiam</u>);
<u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 37 (2d Cir. 1994)
(describing the burden of production as <u>de minimis</u>); <u>Bogart v.
New York City Health & Hosps. Corp.</u>, 98 Civ. 6118 (TPG), 2001 WL
504874 at *5 (S.D.N.Y. May 11, 2001) (Griesa, D.J.).

        If a plaintiff succeeds in establishing a <u>prima facie</u>
case, a presumption is created "that the employer discriminated
against the employee in an unlawful manner," <u>Greenway v. Buffalo
Hilton Hotel</u>, <u>supra</u>, 143 F.3d at 52, and the burden then shifts
to the employer to rebut the presumption by articulating a

legitimate, nondiscriminatory reason for its actions.  <u>Dawson v.</u>
<u>Bumble & Bumble</u>, 398 F.3d 211, 216 (2d Cir. 2005); <u>Farias v.</u>
<u>Instructional Sys., Inc.</u>, <u>supra</u>, 259 F.3d at 98; <u>Carlton v.</u>
<u>Mystic Transp., Inc.</u>, <u>supra</u>, 202 F.3d at 134; <u>Bickerstaff v.</u>
<u>Vassar Coll.</u>, <u>supra</u>, 196 F.3d at 446; <u>Gallo v. Prudential Resi-</u>
<u>dential Servs., Ltd. Partnership</u>, <u>supra</u>, 22 F.3d at 1224.

> The defendant's burden of production also is not a
> demanding one; [it] need only offer such an explanation
> for the employment decision . . . .  Although the
> burden of production shifts to the defendant, the
> ultimate burden of persuasion remains always with the
> plaintiff.

<u>Bickerstaff v. Vassar Coll.</u>, <u>supra</u>, 196 F.3d at 446 (citations
omitted).

If the employer articulates a non-discriminatory reason
for the termination, the presumption of discrimination raised by
the <u>prima facie</u> case "simply drops out of the picture."  <u>St.</u>
<u>Mary's Honor Ctr. v. Hicks</u>, <u>supra</u>, 509 U.S. at 510-11; <u>see</u>
<u>Carlton v. Mystic Transp., Inc.</u>, <u>supra</u>, 202 F.3d at 134-35; <u>Green</u>
<u>v. Harris Publ'ns, Inc.</u>, 331 F. Supp. 2d 180, 187 (S.D.N.Y. 2004)
(Chin, D.J.).  At this point, the burden shifts back to the
plaintiff to offer proof that would allow a rational fact finder
to conclude that the employer's proffered reason for the termina-
tion was pretextual.  <u>St. Mary's Honor Ctr. v. Hicks</u>, <u>supra</u>, 509
U.S. at 507-08; <u>Carlton v. Mystic Transp., Inc.</u>, <u>supra</u>, 202 F.3d

at 135.  Although the presumption of discrimination "drops out of
the picture" once the defendant meets its burden of production,
"the trier of fact may still consider the evidence establishing
the plaintiff's <u>prima facie</u> case and inferences properly drawn
therefrom . . . on the issue of whether the defendant's explana-
tion is pretextual . . . ."  <u>Reeves v. Sanderson Plumbing Prods.,
Inc.</u>, 530 U.S. 133, 143 (2000) (internal quotation marks omit-
ted); <u>Dawson v. Bumble & Bumble</u>, <u>supra</u>, 398 F.3d at 216.  "[A]
plaintiff's prima facie case, combined with sufficient evidence
to find that the employer's asserted justification is false, may
permit the trier of fact to conclude that the employer unlawfully
discriminated."  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>,
<u>supra</u>, 530 U.S. at 148.

In <u>Schnabel v. Abramson</u>, 232 F.3d 83, 90 (2d Cir.
2000), the Second Circuit explained the impact of the Supreme
Court's decision in <u>Reeves</u> as follows:

> In examining the impact of <u>Reeves</u> on our precedents, we
> conclude that <u>Reeves</u> prevents courts from imposing a
> <u>per se</u> rule requiring <u>in all instances</u> that [a] claim-
> ant offer more than a prima facie case and evidence of
> pretext . . . .  But the converse is not true;  follow-
> ing <u>Reeves</u>, we decline to hold that <u>no</u> [] defendant may
> succeed on a summary judgment motion so long as the
> plaintiff has established a prima facie case and pre-
> sented evidence of pretext.  Rather, we hold that the
> Supreme Court's decision in <u>Reeves</u> clearly mandates a
> case-by-case approach, with a court examining the
> entire record to determine whether the plaintiff could
> satisfy his "ultimate burden of persuading the trier of

> fact that the defendant intentionally discriminated
> against the plaintiff." <u>Reeves</u>, 530 U.S. at ---, 120
> S.Ct. at 2106 (internal quotation marks omitted).

<u>See also</u> <u>Hill v. Citibank Corp.</u>, 312 F. Supp. 2d 464, 478

(S.D.N.Y. 2004) (Koeltl, D.J.).

Furthermore, in <u>James v. New York Racing Ass'n</u>, 233

F.3d 149, 155 (2d Cir. 2000), the Second Circuit explained that

proof that the employer's non-discriminatory explanation is false

does not inevitably establish illegal discrimination:

> We reasoned in <u>Fisher</u> that "evidence constituting a
> prima facie case prior to the employer's proffer of a
> reason, coupled with the error or falsity of the em-
> ployer's proffered reason may -- or may not -- be
> sufficient to show illegal discrimination." <u>Fisher</u>,
> 114 F.3d at 1333.  In nearly identical terms the Su-
> preme Court explained in <u>Reeves</u> that in some circum-
> stances, a prima facie case plus falsity of the em-
> ployer's explanation can, without more, be enough to
> support a reasonable finding that prohibited discrimi-
> nation has occurred . . . .

233 F.3d at 155.

C.  Application of
the Foregoing
<u>Principles to this Case</u>

1.  Plaintiff's
<u>ADA Claim</u>

Defendant claims that plaintiff abandoned her ADA claim

by failing to address it in her opposition papers (Def.'s Reply

Mem. at 2-3).  Indeed, plaintiff's only purported discussion of

28

disability in her affirmation is her statement that Leitson was aware that plaintiff suffered from asthma because plaintiff's doctors' notes cited this malady (Pl.'s Affirmation at 11; Doctors' Notes, dated April 8, 2002, April 9, 2002, March 24, 2003, and October 27, 2003, attached to Pl.'s Affirmation as Ex. 7).  Plaintiff does not describe her asthma as a disability, and fails to allege any facts suggesting that her asthma played any role in the way defendant treated her.  Likewise, her complaint stated only that her termination was partly the result of her being "disabled" without providing any supporting facts or explanation of this claim (Pl.'s Submission at 3).  Accordingly, because plaintiff has failed to provide any evidence in the record adequately supporting this claim, she has failed to demonstrate the existence of a genuine issue of fact, and summary judgment dismissing plaintiff's ADA claim should, therefore, be granted.  See Environmental Equip. & Serv. Co. v. Wachovia Bank, N.A., No. 08-1478, 2010 WL 3768132 at *18 (E.D. Pa. Sept. 23, 2010); Hawkins v. County of Oneida, N.Y., 497 F. Supp. 2d 362, 379-80 (N.D.N.Y. 2007).

        2.  Plaintiff's
            Title VII Claims

        A prima facie case under Title VII has four elements:
(1) plaintiff is a member of a protected class, (2) plaintiff is
competent or qualified to perform the job or is performing her
duties satisfactorily, (3) plaintiff was subject to an adverse
employment action and (4) the adverse employment action occurred
under circumstances that give rise to an inference of discrimina-
tion on the basis of plaintiff's membership in a protected class.
Dawson v. Bumble & Bumble, supra, 398 F.3d at 216; Collins v. New
York City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002);
Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 316 (2d Cir.
1999); Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d
Cir. 1999); Hills v. City of New York, 03 Civ. 4265 (WHP), 2005
WL 591130 at *3 (S.D.N.Y. Mar. 15, 2005) (Pauley, D.J.); Beckmann
v. Darden, 351 F. Supp. 2d 139, 146 (S.D.N.Y. 2004) (Robinson,
D.J.); Williams v. Salvation Army, 108 F. Supp. 2d 303, 308
(S.D.N.Y. 2000) (Berman, D.J.).

        Defendant claims that plaintiff has abandoned her
claims of discrimination based on her gender, national origin,
and religion because she did not address them in her opposition
papers (Def.'s Reply Mem. at 2-3).  Indeed, plaintiff makes no
reference whatsoever to these claims in her affirmation.  Her

                              30

complaint similarly failed to allege any facts suggesting dis-
crimination on any of these grounds, other than plaintiff's
conclusion that "I was terminated unlawfully for the reasons
Karen Leitson stated of failure to follow instructions, insubor-
dination, and actions intentional and detrimental to the hospital
and patient care but it was really a result of my being Latina, a
woman, disabled, a Christian, and complaining to Labor Relations"
(Pl.'s Submission at 3).  Accordingly, because plaintiff has not
offered any evidence in the record sufficient to suggest that
discrimination based on gender, national origin and religion
played any role in defendant's treatment of her, there is no
genuine issue of fact concerning these allegations of discrimina-
tion and defendant's motion should also be granted with respect
to those claims.

         Plaintiff's claim of racial discrimination remains.
However, even if I make the generous assumption that plaintiff
can establish a prima facie case of race-based discrimination,
defendant has offered documented, non-discriminatory reasons for
plaintiff's termination, namely her excessive absenteeism,
tardiness, insubordination and poor job performance.  Thus, under
the McDonnell Douglas analysis, plaintiff must now come forward
with evidence that gives rise to a genuine issue of material fact

31

that race-based discrimination was at least one of the reasons for the termination of plaintiff's employment.

Defendant claims that plaintiff has failed to meet this burden because (1) plaintiff has not denied the misconduct for which she was disciplined and later terminated; (2) there is a presumption against discrimination when the same person hired and fired plaintiff; (3) plaintiff cannot prevail on a failure-to-promote claim because she never applied for a promotion; (4) disciplinary warnings and negative performance appraisals do not constitute adverse employment actions and (5) there is no evidence of disparate treatment based on plaintiff's race (Def.'s Reply Mem. at 3).

> a.  Plaintiff's Failure
> to Deny Misconduct

Plaintiff has offered several excuses for her misconduct, but she largely does not challenge defendant's description and documentation of her poor job performance.  For instance, although plaintiff claims that she "concluded that it was allowed to come in a few minutes late" because she had observed others doing so without reprimand (Pl.'s Affirmation at 3), her alleged conclusion that chronic tardiness was acceptable performance is belied by the fact that plaintiff was disciplined

32

on several occasions for her tardiness, and by her observation
that others were reprimanded for this behavior as well (Pl.'s
Affirmation at 3, 6).  Most notably, plaintiff never denies that
she was tardy on numerous occasions.

Plaintiff also does not deny her failure to adequately
complete certain assignments and to respond to her supervisors.
For example, plaintiff admits that she did not respond to an
email from Leitson concerning "Missing Charts" on April 25, 2002
because she customarily did not respond to Leitson via email
(Pl.'s Affirmation at 3).  As stated in Section II.A.1., the
evidence demonstrates that plaintiff actually communicated with
Leitson via email often.  Notably, plaintiff never claims to have
completed this assignment, nor does she state that she did, in
fact, respond to Leitson.  Instead, she generally states "I never
ignored any subject matter she brought to my attention" (Pl.'s
Affirmation at 3).

Similarly, plaintiff claims that she always confirmed
appointments but cites "a system software problem" which pre-
vented her from doing so on May 7, 2003 (Pl.'s Affirmation at 4).
However, the Documented Conference following this incident states
that, while plaintiff's computer lacked the software which "would
allow [her] to confirm patients with greater ease," she could
have retrieved the necessary information from other sources and

33

completed this task (Documented Conference, dated May 8, 2003,
attached to Leitson Decl. as Ex. 7, at 1).  Plaintiff makes no
effort to respond to this evidence.

Plaintiff also claims that, despite her negative
evaluations, she did "in fact plan, organize, and prioritize
[her] daily duties and responsibilities using Microsoft Outlook"
(Pl.'s Affirmation at 5).  However, the Microsoft Outlook pages
which plaintiff provides only pertain to assignments on December
14, 2001.  Likewise, one task list which plaintiff provided is
dated October 15, 2002 and the other is not clearly dated at all
(Outlook Pages at 1-7).  These documents seem to refer to tasks
completed on only two or three separate dates during plaintiff's
four years of employment and, therefore, do not create a genuine
issue of fact regarding the many instances defendants cite of her
failure to prioritize and complete assignments.  In fact, plain-
tiff does not claim to have adequately completed any assignment
cited by defendant.  Her conclusory statement that "I knew the
job inside and out" (Pl.'s Affirmation at 3) does not negate the
specific instances of poor performance cited by defendant and
corroborated by contemporaneous documentation.

In addition, plaintiff's failure to recall some of her
negative evaluations does not explain or refute their contents.
Specifically, plaintiff claims that she does not recall her

34

Documented Conference on May 28, 2002 (Pl.'s Affirmation at 4),
nor her evaluation by Gluck and Kochman on February 25, 2003
(Pl.'s Affirmation at 7-8).  Plaintiff does not deny nor explain
the misconduct discussed at the conference and in the evaluation
and, therefore, does not controvert the misconduct described by
defendant.  The same is true of plaintiff's claim that Kochman's
reviews were truly Leitson's because "Kochman was a very kind and
good-spirited manager and did not ever use the language Leitson
deployed towards the Hispanic employees" (Pl.'s Affirmation at
8).  Plaintiff's subjective belief that Kochman would not evalu-
ate her unfavorably does not create a factual dispute as to
whether Kochman's negative evaluation was, in fact, Kochman's.

        Plaintiff also claims that she did not yell at Leitson
at their November 25, 2003 meeting, but does not deny making the
accusation "Karen, you are lying" (Final Warning at 1; Pl.'s
Affirmation at 5).  This explanation does little to discount
defendant's claim that plaintiff was insubordinate on this
occasion.

        The same is true of plaintiff's account of her final
confrontation with Leitson.  Though plaintiff does not address it
in her affirmation, she challenged Leitson's version of their
June 28, 2004 conversation in a letter to Jane Maksoud.  While
defendant is not entirely correct that plaintiff admitted "that

she refused to answer her supervisor's questions about physi-
cians' schedules" (Def.'s Mem. in Supp. at 13), plaintiff did
report to Maksoud that she ended the conversation with Leitson by
stating "I am not going to answer that" (Maksoud Letter at 2).
While plaintiff claimed that Leitson was aggressive and demand-
ing, she admitted that the conversation centered on whether
plaintiff's email aptly answered Leitson's inquiry and ended with
plaintiff's refusal to further discuss the matter with her
supervisor.  Defendant also notes that plaintiff does not refer-
ence discrimination or retaliation in this letter, further
undermining her claim that defendant engaged in such conduct
(Def.'s Mem. in Supp. at 13).

        Resultantly, plaintiff has largely failed to dispute
defendant's allegations of poor performance and misconduct.  The
explanations that she has provided are mostly self-serving,
conclusory statements which do not controvert the evidence of
misconduct and insubordination and do not create a genuine issue
of material fact needing resolution at trial.  See Ghirardelli v.
McAvey Sales & Serv., Inc., 287 F. Supp. 2d 379, 391 (S.D.N.Y.
2003) (Marrero, D.J.).  To the extent that plaintiff admits her
misconduct, these admissions negate any inference of discrimina-
tion.  Spahr v. Am. Dental Ctrs., 03 Civ. 4954, 2006 WL 681202 at
*5 (E.D.N.Y. March 14, 2006); Pruitt v. Metcalf & Eddy Inc., 03

Civ. 4780 (DF), 2006 WL 39621 at *14-15 (S.D.N.Y. Jan. 6, 2006)
(Freeman, M.J.); <u>Allen v. St. Cabrini Nursing Home, Inc.</u>, 198 F.
Supp. 2d 442, 450-51 (S.D.N.Y. 2002) (McMahon, D.J.); <u>Jetter v.
Knothe Corp.</u>, 200 F. Supp. 2d 254, 263-64 (S.D.N.Y. 2002)
(Buchwald, D.J.).  Even if plaintiff could establish that defen-
dant incorrectly evaluated her performance, she would still need
to prove that her termination was not based on the grounds
asserted and that her race played a role in the decision to
terminate her employment, both of which she failed to do.  <u>Fahie
v. Thornburgh</u>, 746 F. Supp. 310, 315 (S.D.N.Y. 1990) (Carter,
D.J.).

> b.  Leitson's Hiring
>     <u>and Firing of Plaintiff</u>

Defendant also argues that "[a]ny inference of
race . . . discrimination is negated by the fact that Leitson
hired Vasconcellos in November 1999, evaluated her favorably from
1999 to 2001 and terminated her in June 2004" (Def.'s Mem. in
Supp. at 15), <u>citing</u> <u>Grady v. Affiliated Cent., Inc.</u>, 130 F.3d
553, 560 (2d Cir. 1997) <u>and</u> <u>Spadaro v. McKeon</u>, 693 F. Supp. 2d
183, 188 (N.D.N.Y. 2010).  Indeed, plaintiff does not dispute
that Leitson hired, fired, and evaluated her favorably for this
period.  Defendant also points out, and plaintiff does not

refute, that Leitson hired, promoted and favorably evaluated other Hispanic employees (Def.'s Mem. in Supp. at 19).  This evidence further negates any inference of discrimination.

### c.  Failure to Promote
### and Transfer Plaintiff

While plaintiff does not allege in her complaint that defendant discriminatorily failed to promote her (Def.'s Mem. in Supp. at 16), plaintiff did claim at her deposition that promotions were made in a discriminatory fashion, and argued in her affirmation that she was unfairly denied lateral transfers.

To prove a claim for discriminatory failure to promote, plaintiff must establish "(1) that [she] is a member of a protected class; (2) that [she] applied for a position for which [she] was qualified; (3) that [she] was rejected for the position under circumstances suggesting an inference of discrimination; and (4) that the employer kept the position open and continued to seek applicants." Manessis v. New York City Dep't of Transp., 02 Civ. 359 (SAS), 2003 WL 289969 at *9 (S.D.N.Y. Feb. 10, 2003) (Scheindlin, D.J.), citing Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998).  While plaintiff, as a racial minority, is part of a protected class, there is no evidence that she was discriminatorily denied a promotion.

Plaintiff first mentioned defendant's discriminatory promotion system during her deposition stating "only – my coworkers that were Jewish were being promoted[,]" citing Anne Rose, a patient care assistant ("PCA"), as an example (297:8-13 Pl.'s Dep.).  This statement is irrelevant to plaintiff's claim of racial discrimination because plaintiff claimed that Rose was promoted due to her religion.  However, plaintiff later testified that she did not know whether Rose was actually promoted, and that plaintiff had not pursued any of the same promotion opportunities (298:21-22; 298:25-299:4; 300:7-14 Pl.'s Dep.).

When asked to name the promotions that she had actually applied for, plaintiff stated "there was another patient care assistant position I applied for, there was another position that Bruce Noel had informed me about . . . some of them were lateral promotions.  Some of them were just other equivalent positions .- . . there were about three that I can recall" (302:3-15 Pl.'s Dep.).  Plaintiff testified that she applied for a PCA position (302:16-21 Pl.'s Dep.), which required a Bachelor's degree[12] (302:25-304:15 Pl.'s Dep.).  She testified that she did not have this degree, but that the New York State Labor Department would

---

[12]Plaintiff noted that the PCA job description which was used as an exhibit at her deposition was not dated, but seemed to correspond to the PCA position that she had applied for (302:25-304:3 Pl.'s Dep.).

consider her years of experience equivalent to it (304:18-305:17
Pl.'s Dep.).  Plaintiff testified that she believed Diane
Vreeland, who she thought previously worked outside Mount Sinai
Medical Center, filled this PCA position (305:18-306:11 Pl.'s
Dep.).  To the extent that plaintiff claims defendant denied her
this promotion based on racial animus, this claim fails.  While
it is arguable whether plaintiff was qualified for this position,
plaintiff has not asserted any facts to support an inference of
discrimination in her rejection, nor does she claim that the
position was left open.

        Likewise, to the extent plaintiff claims that she was
discriminatorily denied the promotion described by Bruce Noel,
this claim also fails.  Plaintiff testified that she did not
actually apply for this position, nor did she learn of its
required qualifications (309:4-22 Pl.'s Dep.).  She could not
recall who ultimately filled this position (312:2-5 Pl.'s Dep.).

        Plaintiff's affirmation does not identify any other
promotions for which she actually applied.  In contrast, Karen
Johnson reports that "Mount Sinai's Recruitment Department
maintains files for employees that submit applications for
promotional opportunities.  I have been in contact with the
Recruitment Department and there is no file for Vasconcellos"
(Johnson Decl. ¶ 14).  Therefore, to the extent plaintiff claims

40

defendant discriminatorily failed to promote her, that claim does
not survive summary judgment.

Plaintiff also argues that Leitson's racial discrimina-
tion motivated her to refuse plaintiff lateral transfers (313:22-
314:11 Pl.'s Dep.).  The third prong of a McDonnell Douglas prima
facie case requires that plaintiff establish "that this inaction
constituted an adverse employment action." Williams v. R.H.
Donnelley, Corp., 368 F.3d 123, 128 (2nd Cir. 2004), citing
McDonnell Douglas Corp. v. Green, supra, 411 U.S. at 802.
Adverse employment actions include "'a termination of employment,
a demotion evidenced by a decrease in wage or salary, a less
distinguished title, a material loss of benefits, significantly
diminished material responsibilities, or other
indices . . . unique to a particular situation.'" Williams v.
R.H. Donnelley Corp., supra, 368 F.3d at 128, quoting Galabya v.
New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).
The Second Circuit has held:

> "[t]o be materially adverse a change in working condi-
> tions must be more disruptive than a mere inconvenience
> or an alteration of job responsibilities." Id. (cita-
> tion and internal quotation marks omitted). . . .
>
> As the Tenth Circuit has noted, "[i]f a transfer
> is truly lateral and involves no significant changes in
> an employee's conditions of employment, the fact that
> the employee views the transfer either positively or
> negatively does not of itself render the denial or
> receipt of the transfer [an] adverse employment ac-

41

> tion."  Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532-
> 33 n. 6 (10th Cir. 1998) . . . . [S]ubjective, personal
> disappointments do not meet the objective indicia of an
> adverse employment action.  Galabya, 202 F.3d at 640.

Williams v. R.H. Donnelley Corp., supra, 368 F.3d at 128 (inter-
nal citations omitted).

Plaintiff testified that she had wanted to transfer
from her full-time, non-union affiliated position in Leitson's
department, to two part-time positions: one in Leitson's depart-
ment and one in the pathology department, which was union affili-
ated (313:6-7; 315:17-316:6; 320:11-321:4 Pl.'s Dep.).  Plaintiff
testified that she applied for and was offered a part-time
lateral position in the pathology department, but Leitson did not
approve her transfer (312:6-313:7 Pl.'s Dep.).  Plaintiff argues
that Leitson denied this request because she "just needed some-
thing that she can, you know, she can stop what I was wanting to
do was just not to work under her anymore, and to continue being
racially discriminatory to -- it was just who she was" (314:6-10
Pl.'s Dep.).  Plaintiff testified that Leitson also denied her
request to work part-time in her own department because Leitson
claimed to need her full-time (315:23-316:11 Pl.'s Dep.).
Leitson informed plaintiff that she could not transfer in this
manner in any case because she could not hold union and non-union
and positions simultaneously.  Plaintiff argues that this re-

42

striction only applied to "supervisory employees" (Pl.'s Affirmation at 8).[13]

Plaintiff has not established that Leitson's denial of these transfers constitutes adverse employment action because plaintiff has provided little to no information about these transfers to indicate whether they would entail significantly different requirements and responsibilities.  As noted above, plaintiff's subjective belief that she preferred to be transferred is not sufficient to render these denials adverse employment actions.  Furthermore, defendant claims that plaintiff's written warnings would have prevented her from being transferred, and that Mount Sinai did not allow employees to hold part-time union and non-union position simultaneously (Def.'s Mem. in Supp. at 17; Johnson Decl. ¶ 17; Tiger-Paillex Decl. ¶¶ 2-3).  Defendant also notes that supervisors are under no obligation to grant requests for part-time employment when an employee is needed full-time (Def.'s Mem. in Supp. at 18; Johnson Decl. ¶ 18).  Because plaintiff has not properly alleged or demonstrated the

---

[13]At her deposition, plaintiff also discussed a transfer offer from Tiger-Paillex in November 2003 which Leitson denied (329:24-330:16 Pl.'s Dep.; Pl.'s Affirmation at 10-11).  Plaintiff does not claim in her affirmation that this denial was based on racial discrimination.

existence of an adverse employment action, summary judgment should be granted dismissing these claims.

        d.  Disciplinary Warnings to
           and Negative Evaluations
           of Plaintiff

        Defendant also claims that the disciplinary warnings and negative evaluations issued to plaintiff do not constitute adverse employment actions (Def.'s Mem. in Supp. at 18; Def.'s Reply Mem. at 4), citing Uddin v. City of New York, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) (Sweet, D.J.) and Turner v. Davidson/Gilmour Pipe Supply, No. 04 CV 3278 (ARR), 2006 WL 1652613 at *8 (E.D.N.Y. June 14, 2005).  Although plaintiff does not controvert this proposition, defendant's argument somewhat overstates the applicable legal principal.

        "Reprimands or negative evaluation letters may, in some circumstances, constitute adverse employment action, . . . and whether they do is typically a question of fact for the jury." Lawrence v. Mehlman, 389 F. App'x 54, 56 (2d Cir. 2010).  However, where there is no evidence that would support a finding that a reprimand has an impact on the terms and conditions of employment, it appears that the reprimand does not constitute an adverse employment action.  Lawrence v. Mehlman, supra, 389 F. App'x at 54 (affirming summary judgment in favor of defendant

where reprimand was removed from plaintiff's file after six weeks
with no evidence of any consequences); <u>Sanders v. New York City
Human Resources Admin.</u>, 361 F.3d 749, 756 (2d Cir. 2004) (affirm-
ing defendant's verdict where there was no evidence that negative
evaluations affected the terms and conditions of employment);
<u>Honey v. County of Rockland</u>, 200 F. Supp. 2d 311, 320 (S.D.N.Y.
2002) (McMahon, D.J.) ("[C]ourts in this circuit have found that
reprimands, threats of disciplinary action and excessive scrutiny
do not constitute adverse employment actions in the absence of
other negative results such as a decrease in pay or being placed
on probation."); <u>Stembridge v. City of New York</u>, 88 F. Supp. 2d
276 (S.D.N.Y. 2000) (Motley, D.J.) (no actionable harm where
"reprimand contained a warning that repetition of improper
behavior could result in disciplinary action but contained no
indication of any planned discipline or further action"); <u>Castro
v. New York City Bd. of Educ. Personnel</u>, 96 Civ. 6314 (MBM), 1998
WL 108004 at *7 (S.D.N.Y. Mar. 12, 1998) (Mukasey, D.J.)
("[A]lthough reprimands and close monitoring may cause an em-
ployee embarrassment or anxiety, such intangible consequences are
not materially adverse alterations of employment conditions.").
Plaintiff does not allege or offer any evidence that the warnings
and negative evaluations issued to her had any effect on the
terms or conditions of her employment.  There is no evidence or

allegation that she was disciplined as a result of the warnings and evaluations, that her pay or promotional opportunities were affected by them, or that the warnings and evaluations themselves played any role in the decision to terminate plaintiff's employment.  Under these circumstances, the warnings and negative evaluations do not constitute adverse employment actions.

>           e.  Plaintiff's Claim
>               of Disparate Treatment

Throughout her affirmation, plaintiff claims that defendant treated Hispanics and non-Hispanics disparately.

Where a plaintiff is relying on differences in treatment to establish an inference of discrimination, the plaintiff bears the burden of demonstrating that a putative comparator is similarly situated in all material respects.  Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) ("When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, we have said that the plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.") (internal quotations omitted); accord Bennett v. Verizon Wireless, 04-CV-6314 (CJS), 2008 WL 216073 at *2 (W.D.N.Y. Jan. 24, 2008); White v. Home Depot Inc., 04-CV-401,

2008 WL 189865 at *6 (E.D.N.Y. Jan. 17, 2008); <u>Augustin v. Yale
Club of New York City</u>, 03 Civ. 1924 (KMK), 2006 WL 2690289 at *25
(S.D.N.Y. Sept. 15, 2006) (Karas, D.J.); <u>Conway v. Microsoft
Corp.</u>, 414 F. Supp. 2d 450, 459 (S.D.N.Y. 2006) (Holwell, D.J.).

   Plaintiff has not satisfied this burden.  For instance,
plaintiff claims that "Hispanics did not hold any PCAA positions
and only Hispanics held administrative assistant positions"
(Pl.'s Affirmation at 9).  In support of these assertions,
plaintiff submits the Human Resources Policy #13.1, which gener-
ally mandates "firm, fair, and equitable discipline" (<u>See</u> Human
Resources Policy, dated March 1, 2010, attached to Pl.'s Affirma-
tion as Ex. 4, at 1).  This document does not substantiate
plaintiff's claims regarding Leitson's staff composition.
Moreover, plaintiff does not give any specific information about
those who did and did not hold such positions, and therefore has
failed to identify any similarly situated employees.

   In addition, where, as here, the claim of disparate
treatment is based somewhat on inconsistent disciplinary prac-
tices, a plaintiff is required "to show that similarly situated
employees who went undisciplined engaged in comparable conduct."
<u>Graham v. Long Island R.R.</u>, <u>supra</u>, 230 F.3d at 40; <u>see</u> <u>Lucibello
v. Yale-New Haven Hosp.</u>, No. 3:03 CV 0814 (RNC), 2005 WL 578324
at *6 (D. Conn. Mar. 10, 2005) ("In cases involving disparate

treatment with regard to discipline, the plaintiff must show that the conduct of the other employee[s] was of comparable seriousness."). Vague claims that plaintiff's treatment was inferior to that afforded to unidentified comparators are insufficient to withstand a motion for summary judgment. Abato v. New York City Off-Track Betting Corp., 03 Civ. 5849 (LTS)(HBP), 2007 WL 1659197 at *6 (S.D.N.Y. June 7, 2007) (Swain, D.J.); Chandler v. AMR Am. Eagle Airline, 251 F. Supp. 2d 1173, 1184 (E.D.N.Y. 2003); Allen v. St. Cabrini Nursing Home, Inc., 198 F. Supp. 2d 442, 450 (S.D.N.Y. April 11, 2002) (McMahon, D.J.); Marks v. Nat'l Commc'ns Ass'n, Inc., 72 F. Supp. 2d 322, 333-34 (S.D.N.Y. 1999) (Leisure, D.J.); see Rookard v. Kateri Residence, Inc., 98 Civ. 8301 (BSJ), 2001 WL 180119 at *4 (S.D.N.Y. Feb. 22, 2001) (Jones, D.J.).

Plaintiff also asserts that "Leitson reprimanded and disciplined all the Hispanic employees during my period there of December 2000 to June 2004[,]" and specifically reprimanded Hispanic employees who were tardy while not reprimanding non-Hispanics who were also tardy (Pl.'s Affirmation at 9). In addition to herself, plaintiff identifies Perez and Del Pilar as Hispanic individuals who informed her that they were disciplined for tardiness and absenteeism (Pl.'s Affirmation at 3, 5-6, 9). However, plaintiff has not identified any similarly situated

48

comparators who engaged in similar conduct and were not repri-
manded.  Moreover, defendant correctly points out that the
statements of Perez and Del Pilar are inadmissible hearsay and
cannot be considered on a motion for summary judgment (Def.'s
Reply Mem. at 6), citing The Upper Deck Co., LLC v. Breakey
Int'l, BV, 390 F. Supp. 2d 355, 360 (S.D.N.Y. 2005) (Cedarbaum,
D.J.).  Defendant also correctly notes that plaintiff simulta-
neously claims that Naomi Lim, a non-Hispanic employee, was
reprimanded for tardiness (Def.'s Reply Mem. at 5; Pl.'s Affirma-
tion at 6).  This statement undermines plaintiff's argument that
only Hispanic employees were reprimanded for tardiness.

       Plaintiff also lists several employees whom she be-
lieves Leitson terminated, namely Duane Colon, Donna Colon, Karen
Liriano and Maria Lopez (Pl.'s Affirmation at 7), and claims that
Leitson also "petitioned for the termination of Del Pilar but was
not successful" (Pl.'s Affirmation at 7).  Plaintiff does not
assert, nor provide evidence of, these individuals' race, the
circumstances surrounding their termination, any individuals who
could act as comparators, nor any other information which would
suggest that they were treated more harshly than others due to
their race.  Moreover, plaintiff has not provided evidence to
dispute Leitson's claim that plaintiff was the only employee whom

49

she fired while working as the Clinical Manager (Leitson Decl. ¶ 39).

Plaintiff also claims that two non-Hispanic employees were able to transfer to part-time positions while plaintiff was denied this opportunity (Pl.'s Affirmation at 8).  At her deposition, plaintiff identified these individuals as Diane Vreeland and Sharon Perkins (321:12-322:10 Pl.'s Dep.).  Plaintiff testified that Vreeland was a PCA[14] and Perkins held the same position as plaintiff (321:18-322:3 Pl.'s Dep.).  In her affirmation, plaintiff claims that Perkins is senior to plaintiff, while Vreeland has less seniority (Pl.'s Affirmation at 8).  Plaintiff has provided no evidence suggesting that these individuals were similarly situated to plaintiff or any other Hispanic employee, nor has she even identified the positions they filled or explained how these part-time positions were similar to the part-time positions plaintiff sought.

Likewise, plaintiff also alleges that Karen Liriano, who plaintiff claims is Hispanic and holds a Bachelor's degree, was not hired and Leitson instead "hired a non-Hispanic, Celeste Li, who had less experience and knowledge of the department than

---

[14]Johnson states that personnel records reveal that Vreeland never held a "Patient Care Administrative Assistant Position" and held the position of Administrative Secretary from July 2002 until she resigned in May 2005 (Johnson Decl. ¶ 15; Employee Profile, attached to Johnson Decl. as Ex. 9).

Liriano and was only a seasonal temporary" (Pl.'s Affirmation at 11).  Again, plaintiff has failed to provide specific evidence of the experience, race, and education of these individuals to determine whether they were similarly situated, and fails to identify the position for which both applied.

Plaintiff also alludes to a "hostile and discriminatory remark" made by Linda Seligson to employee Natalie Emmanuel (Pl.'s Affirmation at 12).  Although plaintiff does not identify the statement nor provide any other information regarding this incident, it appear that plaintiff is referring to Seligson's statement that "Hispanics are not qualified to work in this position[,]" which plaintiff testified about at her deposition (335:11-336:23; 338:10-350:3 Pl.'s Dep.).  While plaintiff's statement attesting to this stray remark is likely inadmissable hearsay, even if admissible "[a]bsent further indicia of discrim-ination, such an allegation is insufficient to establish an inference of discrimination." Szarzynski v. Roche Labs., Inc., No. 07-CV-6008, 2010 WL 811445 at *9 (W.D.N.Y. Mar. 1, 2010). The remark is even more inconsequential because it was not made to plaintiff, about plaintiff, in her presence, and was not connected in any way with any adverse employment action against plaintiff (335:11-336:23; 338:10-350:3 Pl.'s Dep.).

51

Plaintiff's argument that Leitson's effort to hire Spanish-speaking employees is evidence that Leitson discriminated against Hispanics defies logic (Pl.'s Affirmation at 7). Leitson stated "I hired Hispanic employees because the majority of the patients were Spanish and one of the job requirements for these positions was proficiency in Spanish" (Leitson Decl. ¶ 37). It does not follow as a matter of logic that a preference for Spanish language skills, potentially resulting in a greater number of Hispanic employees, is a form of discrimination against Hispanics (Def.'s Reply Mem. at 6).

Finally, plaintiff states throughout her affirmation that Leitson was aggressive and intimidating towards her and other employees (See Pl.'s Affirmation at 2, 5-6). Such conduct, however, would not create an inference of discrimination. "Title VII . . . does not set forth 'a general civility code for the American workplace.'" Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006), quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). "Sporadic use of abusive language . . . is an ordinary tribulation[] of the workplace," Farragher v. Boca Raton, 524 U.S. 775, 788 (1998), and does not give rise to a viable Title VII claim. See also Taylor v. Potter, 99 Civ. 4941 (AJP), 2004 WL 1811423 at *16 (S.D.N.Y. Aug. 16, 2004) (Peck, M.J.) (collecting cases); Cardozo

52

v. Healthfirst, Inc., 210 F. Supp. 2d 224, 234 n. 15 (S.D.N.Y. 1999) (Berman, D.J.) ("the law does not require an employer to like his employees, or to conduct himself in a mature or professional manner") (internal quotations omitted); Gripper v. AT&T, 95 Civ. 4452 (MGC), 1997 WL 282214 at *7-8 (S.D.N.Y. May 28, 1997) (Cedarbaum, D.J.) (friction caused by a supervisor's management style, without evidence of disparate supervision of non-minority employees, does not create an inference of discrimination).

In summary, plaintiff has clearly failed to meet her burden to establish defendant's disparate treatment of Hispanic employees.  She does not identify any adequate comparators to those whom she claims were discriminated against, nor does she offer any evidence to support her claims of defendant's actions. Plaintiff's vague arguments, unsupported by specific facts, will not defeat defendant's properly supported motion for summary judgment.  See also Rochetti v. N.Y. State Dep't of Motor Vehicles, No. 02 CV 1710 (SLT)(LB), 2005 WL 2340719 at *7 (E.D.N.Y. June 13, 2005).

3.   Plaintiff's
Retaliation Claim

To establish a <u>prima facie</u> case of retaliation under
either the ADA or Title VII, an employee must demonstrate that:
(1) she engaged in protected activity; (2) the employer was aware
of this activity; (3) the employer took adverse action against
her and (4) a causal connection exists between the protected
activity and the adverse action, <u>i.e.</u>, that a retaliatory motive
played a part in the adverse employment action.  <u>Sista v. CDC
Ixis N. Am., Inc.</u>, 445 F.3d 161, 177 (2d Cir. 2006); <u>Constance v.
Pepsi Bottling Co. of NY</u>, 03-CV-5009 (CBA)(MDG), 2007 WL 2460688
at *34 (E.D.N.Y. Aug. 24, 2007).  A plaintiff may establish the
requisite causal connection "(1) indirectly, by showing that the
protected activity was followed closely by discriminatory treat-
ment, or . . . (2) directly, through evidence of retaliatory
animus directed against the plaintiff by the defendant."  <u>Gordon
v. New York City Bd. of Educ.</u>, 232 F.3d 111, 117 (2d Cir. 2000).
Where, as here, a plaintiff relies on temporal proximity as
circumstantial evidence of causation, the "temporal proximity
must be 'very close.'"  <u>Little v. Nat'l Broad. Co.</u>, 210 F. Supp.
2d 330, 385 (S.D.N.Y. 2002) (Scheindlin, D.J.), <u>quoting Clark
County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001) (<u>per
curiam</u>); <u>accord Kaytor v. Elec. Boat Corp.</u>, 609 F.3d 537, 552 (2d

54

Cir. 2010) ("Close temporal proximity between the plaintiff's protected activity and the . . . adverse action may in itself by sufficient to establish the requisite causal connection."). However, the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009), quoting Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001).

Once plaintiff demonstrates a prima facie case, the burden shifts to defendant to articulate legitimate, non-retalia-tory reasons for its actions. Once the defendant does so, the burden shifts back to plaintiff to show that the articulated reasons are pretextual. Papelino v. Albany College of Pharmacy of Union Univ., Docket No. 09-4248-cv, 2011 WL 199124 at *8 (2d Cir. Jan. 24, 2011). Although temporal proximity can be suffi-cient to support an inference of causation at the prima facie stage, it is insufficient to show pretext at the third step. El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such

55

temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext. . . . Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact.").

Assuming, without deciding, that the gap between plaintiff's September 2003 complaint and her June 2004 termination will support an inference of causation, see Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980) (affirming factual finding of retaliation notwithstanding eight-month gap between EEOC complaint and retaliatory act), summary judgment is appropriate here. The defendant has offered substantial documentary evidence that it terminated plaintiff for poor performance; the forgoing authorities teach that the burden now shifts to plaintiff to offer evidence that the performance-based reasons given defendant are pretextual. As demonstrated above, plaintiff has not offered evidence sufficient to create an issue of fact that defendant's contention that plaintiff was terminated for poor performance is pretextual. Just as the absence of evidence of pretext warrants summary judgment dismissing plaintiff's discrimination claim, it also warrants summary judgment dismissing of her retaliation claim.

D.   Plaintiff's
     Application for
     Leave to Amend

At the conclusion of her affirmation, plaintiff re-
quests, "if you are inclined to decide against me, may you grant
me leave to move to amend my complaint" (Pl.'s Affirmation at
12).  She states that she would provide new facts to support a
"retaliatory claim based on complaints I made to my superiors of
a health and safety concern of the working premises equipment and
infrastructure" which "also would have included filing a com-
plaint with New York State Occupational Safety and Health Admin-
istration[,]" as well as a "retaliatory claim for having filed a
Workers' Compensation claim" and "a claim of defamation of
character that has caused me emotional, psychological, profes-
sional, and financial harm" (Pl.'s Affirmation at 12).

Plaintiff's proposed claims are not federal in nature
and therefore this Court lacks subject matter jurisdiction to
adjudicate them.  Should plaintiff choose to pursue these claims,
she must file a new complaint in an appropriate state court.

E.   Summary

Because plaintiff failed to offer evidence concerning
her claims of discrimination based on disability, gender, na-

tional origin, and religion, as well as her assertion that defendant terminated her employment in retaliation for her complaints to Labor Relations, summary judgment should be granted with respect to those claims.  In addition, even if I assume that there was evidence in the record sufficient to sustain a <u>prima facie</u> case of racial discrimination, plaintiff has submitted no evidence to rebut the non-discriminatory reasons proffered by defendant for terminating plaintiff's employment.  Thus, summary judgment dismissing the case in its entirety is appropriate.


IV.   <u>Conclusion</u>


        Accordingly, for all the foregoing reasons, defendant's motion for summary judgment should be granted in its entirety.


V.   <u>Objections</u>


        Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from the date of this Report to file written objections.  <u>See also</u> Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, United States District Judge, 500 Pearl Street, Room 630, New York, New York 10007, and to the chambers

of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.   Any requests for an extension of time for filing objections must be directed to Judge Daniels.   FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW.   <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Male Juvenile</u>, 121 F.3d 34, 38 (2d Cir. 1997); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988); <u>McCarthy v. Manson</u>, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:   New York, New York
       February 16, 2011

Respectfully submitted,

HENRY PITMAN
United States Magistrate Judge

Copies mailed to:

Ms. Vasconcellos
170-11 90th Avenue
Jamaica, New York   11432

Rory J. McEvoy, Esq.
Julie L. Sauer, Esq.
Edwards, Angell, Palmer & Dodge LLP
Suite 3500
750 Lexington Avenue
New York, New York   10022